Capitol. Mr. Lee for the appellant, Ms. Fields for the appellate. Good morning, Your Honors. May it please the Court, in representation of Ms. Swann, I believe this matter is a statutory text matter in terms of textuality. I believe it is a statutory  textualism in context and in terms of the structure of the CAA versus what Title VII provides for the executive and for the private industry and private use. The CAA was a statute that was the result of the contract with America in 1995 in which Congress wanted to provide as it did for the other, the executive and the federal agencies that wanted to provide the same workplace statutes, make them available as they wanted to make them available to the instrumentalities of the Congress and the employees of the Congress, instrumentalities being the respondent as being one of the instrumentalities in this matter. In doing it, they provided a statute which was much broader than the Title VII statute in terms of discrimination and retaliation. In doing it, they provided a statute and in analyzing that statute, the Board of Directors, which is the head of the agency, in analyzing Title VII and the different jurisdictions, circuit jurisdictions and how they dealt with Title VII, felt that they had to broaden the statute and broaden their use of what discrimination was under the statutory language of the statute, the CAA 1311A1 and under the statutory language of retaliation under 1317A, where it's all personnel actions under discrimination, all personnel actions if motivated by race, color, sex, national origin, religion. And in 1317, it's all retaliatory actions if motivated by intimidation, if motivated by reprisal or otherwise discrimination. Now in doing that, they created one uniform statute for retaliation for the entire Congressional Accountability Act of the statutes of the 11 statutes that are named. I believe it's in 1302, 2 U.S. Code 1302. There is only one uniform retaliatory statute. Now in doing that, they said, in effect, they said, we have to, because these other statutes have created other case law and other law, this is the reasoning, we have to provide retaliation that covers these other statutes, meaning that if you were to take the NLRB, which if you equate the NLRB case law with the Federal Labor Relations Act, which is very, very similar in terms of how they deal with the same actions. I list a whole lot of NLRB cases in my opening brief. Those cases would not be termed retaliation under Title 7, but they would be termed retaliation under the CAA, under 1317A. So the statute, based on their reasoning, based on intimidation, in the statutory language of the text, broadened the Title 7 definition as used in Brown v. Brody as decided by this Court and some of the later cases as decided by this Court. Now I would say Brown v. Brody has been necessarily rejected for Title 7 by Burlington Northern and Santa Fe v. White by the Supreme Court. However, I would say that it is this necessity to broaden retaliation under 1317A, which is created by the ten other statutes that are listed in 1302 of the Code, in 2 U.S. Code 1302, which may provide lesser retaliation according to their respective case law than it does under the Title 7 respective case law. So if you look at the all personnel decisions, regardless of the weight of the decision, regardless of whether it's a material or tangible action, regardless of whether it comes to summation, that is consistent with the structure of what happens with the structure of 1317, which could be intimidation, which could be otherwise discrimination as used in 1317. It is consistent with the context of the statute. It is consistent with the structure of the statute, 1311, 1317, to make a decision in this case to determine that this is a broader statute than Title 7 discrimination under 2000E2 and a broader statute than under retaliation under Title 7 of 2000E3. That is the essence of the complainant's argument. Irrespective of all the case law that's brought forth in terms of the statutory rules of construction, which has been applied in, I believe it's Utility Regulatory Group versus the EPA by Justice Scalia in that case and applied in Sierra Club versus the EPA in this court, where the same rules of statutory construction have been applied to the textual basis for the case. There's another thing I would also bring up to the court's attention, and that is Halbig versus Burwell. It is the same statutory rules of construction that was set forth in Halbig versus Burwell that we have applied in this matter in terms of the discussion of the case in front of you and in the discussion of the case in Newton, the next case that comes up in front of you after this case. With respect to the respondent's arguments that are not necessarily about the privacy of board decisions, and they bring up the idea that decisions of the court and the board are to be applied by the hearing officers, the decisions of the court and the board are equated as one and the same, even if there is no privacy. I would also respectfully say to the court that a court has the inherent power to necessarily interpret the law that they are required to enforce when they give formal adjudications as they did in the Britton case, which is cited often in our principal brief and subsequent brief. I would also state to the court that, with your indulgence, that the fact that the Federal Circuit, which is the hierarchical circuit court for the Office of Compliance, has necessarily final authority, the Federal Circuit has ruled in favor of a board decision saying that OSHA, retaliation based on OSHA, could be brought as a private cause of action under the CAA under 1317A. So the Federal Circuit itself has necessarily applied the law as defined by the Board of Compliance. I would say that in formal adjudication, the board has not been denied the inherent power to interpret the rules that it has been designated to enforce. The fact that they didn't necessarily provide rules to promulgate any rules or regulations necessarily involving Title VII is quite simple, because they're involved with interpreting the CAA, they are not involved with interpreting Title VII. The fact that, if you read in this brief and if you read in the Newton matter, in their brief, they come across, the respondents state consistently that because of what was done in Burlington Northern and Santa Fe, the two statutes are alike. However, the two statutes are not mentioned, and the case law necessarily representing the Britain case is not brought forth in this court necessarily in any of the decisions of the District Court and any of the decisions of the U.S. Court of Appeals. I don't know necessarily how many matters have been brought before the U.S. Court of Appeals in terms of the CAA. This may very well be the first one dealing with this issue, but I would state that based on a textual analysis and a contextual analysis, that the matter should be resolved pursuant to what was done in Hall Bay, pursuant to what was done in UARG versus the EPA. What would be the specific difference, if you could give an example of some specific differences that you think would occur in the coverage based on your theory? Based on the word of intimidation and based on otherwise discriminate, if someone were to have a proposal to terminate or a proposal to discipline, whatever it is, a suspension or a reprimand, that in and of itself is, A, a personnel decision to bring that decision, and that is, and B, that is an action that can be brought forth without the consummation of that termination or otherwise. Just simply a proposal to terminate or a concurrence in a proposal to terminate. I would say with regard to letters of counseling, this Court and most other courts have said that the letters of counseling are not tangible material personnel actions. Under the CAA, it would be a tangible, it wouldn't even have to rise to the level of a tangible material personnel action. It could be used to intimidate. There are a lot of things that can be brought in terms of personnel actions that can be used to intimidate. If I might jump ahead by saying something in the next case to give you an example, in the next case, Ms. Newton had an action brought before this Court, not this Court, but the district court. Subsequent to those actions, it was not the supervisory staff that wanted to review her work. It was the attorney, the respondent's attorney of counsel within the AOC that wanted to review her work. That doesn't mean whether or not anything resulted from that counsel's review of the work. It's merely the idea that that was intimidating to Ms. Newton because somebody all of a sudden having nothing to do with semi-annual or annual evaluations wants to review her work to see whether or not she's doing the right thing. That in and of itself is intimidating and chilling because if she had not brought that action in front of the Office of Compliance and later on in the U.S. District Court, then this would not have happened and her work would not have been reviewed, if that would  have been the case. Thank you. We'll give you the remaining time for rebuttal, unless you have more. Good morning, Your Honor. Good morning. Your Honor, I'd like to first discuss the sex discrimination count and Mr. Lee's argument that the CAA is different from Title VII in terms of the standard for discrimination. First of all, Mr. Lee's argument requests this Court to overturn prior precedent of this Court in Blackman-Malloy, in Brady v. Office of Sergeant-at-Arms, and in the Fields case, which all state that Title VII was incorporated into the CAA. Further, Your Honor, if you compare the statutory language upon which Mr. Lee is relying, which is 2 U.S.C. Section 1311, that is the statute that incorporates Title VII into the CAA, with the statute which incorporated the executive branch into Title VII, the language is exactly the same. Therefore, if Mr. Lee is correct, this Court would have to overturn a long, long history of cases in which this Court has held that Title VII for the executive branch is exactly the same as Title VII is for the public sector. And I would invite you to compare 42 U.S.C. Section 2000E-16 to the CAA language. The language, except for the description of the employees covered, is the same. It says, All personnel actions affecting employees or applicants for employment in executive agencies, including employees up on the hill, shall be made free from any discrimination based on race, color, religion, sex, or national origin. That is exactly the language which the CAA uses, which states, All personnel actions affecting covered employees, meaning employees up on the hill, shall be made free from any discrimination based on race, color, religion, sex, or national origin. The only difference, it says, within the meaning of Section 703 of the Civil Rights Act of 1964. What about on the retaliation side? On the retaliation side, Your Honors, when you look at the history of the case law which has developed on the board side and the case law which has developed in Title VII, the rules are exactly the same. If you look at Britain, Britain determined that Title VII would be the framework which was used for deciding retaliation cases. At the time Britain was decided, there was a split among the circuits, and the board chose to use the DEL standard, which it felt was broader and would effectuate the intimidation process. Portions of the CAA, when Rochon was decided and then Burlington Northern was decided, that same standard which was used by Britain was used in Rochon and then in Burlington Northern, which was that it did not have to be an adverse employment action, but that any materially adverse action, an action which would negatively affect a person's ability in terms of seeking EEO activity would be sufficient to cause a complaint of retaliation. To give his argument it's due, I think what he would respond is that the precise language of the statute is somewhat broader than the case law retaliation. When Britain decided for the board retaliation, Britain thought that the EEO standard was sufficient to include the broader language under the CAA, and I submit that it does, Your Honor. You're saying the Britain standard of any adverse treatment that's based on retaliatory and reasonably likely to deter a charging party from engaging in protected activities is essentially what Burlington said? Yes, sir. All right. Assuming that's right, there's certainly not a lot of room to quibble over them in terms of the stated standards, but assuming that's right, did the district court apply the Burlington standard? Yes, it did, Your Honor. Really? It looks a little loose to me. Well, I believe that we requested the court to be clear about that, and the court indicated that it wasn't that. I didn't realize the court was kind of going off track. Well, it was an oral opinion, Your Honor, so not as tight as a written opinion sometimes. But yes, the court did indicate that it was using the Burlington standard. Because I think one of the cases cited initially was incorrect, that the district court cited, right? I'm not sure, Your Honor. I'd have to look at the record again. But then you think government counsel's request to get back on track was enough to make it clear that the district court was applying the Burlington written standard? Yes, yes, sir, because after I requested that clarification, the court said that it was using that standard. All right. So in the locker room claim, the 180 days claim, why isn't that a continuing violation, the locker room district treatment, that would therefore continue, therefore making it timely? It's kind of interesting to think about one of the difficult issues in this context generally is always continuing violations. Why do you think that one is not? Well, Your Honor, let me turn it around. Let's assume that it were a continuing violation. Right. If it were a continuing violation, using the Morgan standard, one of the adverse actions would have had to occur within some 180-day period of the request for counseling to the Office of Compliance. And there was no evidence of any adverse action concerning Ms. Swan within an 180-day period of counseling. The decision which was made was made outside of the 180-day period. She indicated that she was harmed because she would be dressed late and would be docked and would have to take 15 minutes of annual leave because she was late. But none of the evidence showed that that ever occurred. In the evidence were her time sheets, and she was never docked any 15 minutes within a 180-day period of counseling. Isn't that taking the least generous view of her complaint? That is, merely being required to use a locker room shared with men, and she's the only female, is itself actionable discrimination. Whether or not there are specific incidents, she didn't have to be beaten up in the locker room or not allowed to use it or be laid. Isn't the mere fact of being required to work in that kind of a situation, isn't that what she's saying? I'm not saying... You're saying the only thing we can focus on is incidents that flow from that, as distinguished from being forced to use a locker room with men? Well, Your Honor, first of all, this is not a locker room that has showers. This is merely a room that has lockers in it. There's a little sink also in there. But you dress. And she... But you dress. I realize standards are much looser now than when I grew up, but there's still some people who would prefer to dress single-sex. Yes, Your Honor, but she has shown nothing adverse that occurred to her concerning the locker room. She indicated her testimony ultimately was that she dressed at home in her uniform. Which men didn't have to do. A lot of men did the same thing, Your Honor. Didn't have to. They didn't have to. They didn't have to. And she didn't... And she did not have to do that either. If you actually was offered an option of being earlier or later in the use of the locker room, is that not correct? Excuse me, I'm sorry. Wasn't she offered an option of using the locker room earlier or later than the men or do I misremember? She was given the same access to the locker room as the men, Your Honor. So it was not the case that she could have come in before the men and had a lock or come in after the men and used the lock? Yes, Your Honor, that's... That's what I'm asking you. That is the record, right? Yes, sir. All right. And also, is it in the record that there was a ladies' restroom across the hall from the locker room? Yes, sir. There was a ladies' restroom right across the hall from the locker room. And she was entitled, if she wished, to dress at home and wear her uniform to work, right? Yes, sir. And it's also in the record that there was another locker room on the other side of the hallway that she could have also used, which had shower facilities. And although she couldn't leave her work clothes there overnight, she could use it during the day to store her clothes in there, Your Honor. Thank you. I think that's a good response to the locker room issue, although it is interesting. The 180-day thing, I just found interesting. Did the district court rely on the 180-day issue for the locker room claim, right? The locker room claim was done in two ways, as a disparate treatment claim and also as a disparate impact claim, Your Honor. As to the disparate treatment claim, we focused on the decision to use the locker room. Right. And the court found that that was not within the 180-day period. Right. And on the disparate impact argument, we show that there was no evidence of any disparate impact or negative effect concerning her within the 180-day period for disparate impact. Any other questions, Your Honor? Thank you. Thank you. Thank you. If Your Honor, please, with respect to the locker room, I don't think any of the conditions Excuse me. Any other conditions in the locker room were any necessarily different than what Jackie Robinson had to put up with in 1948 when he went with Montreal and then was brought up to the Dodgers. It's the same argument, well, he could dress later or he could come in earlier. It's the same argument which provided him with second-class status until something happened on the baseball diamond with Pee Wee Reese. With respect to the argument that she could have come in earlier, she could not necessarily come in earlier because there were 15 people getting off the night shift who used the same locker room before the day shift. And they're in there all at the same time, 6.30, 7 o'clock type of thing, so she couldn't necessarily use What do you think would have been a reasonable accommodation when you hired the first female and the previously all-male job in this situation? I think had they said to her, you can use the other locker room and we will not dock you for any time expended in terms of when it's Did they ever dock her for anything? I believe they did, sir, but that Does the record reflect that they ever docked her? No, sir, not with regard to that. Okay, thank you. Not with regard to that. And the other thing that the government is saying is that the decision to put her in this situation occurred well before she filed any complaint. Jackie Robinson didn't have a complaint procedure. She did have a complaint procedure and she had time limits that she had to meet. So when she knew coming in the door she was facing it, she had time limits to raise that complaint, she didn't do it. I would not necessarily argue with your time limit argument, Your Honor. However, I would state that she didn't know how serious the matter would become or how grave it would become. That's about individual incidents. That's about individual incidents. That's different. So you're saying she's past the time on the disparate treatment claim, that is Yes, sir. I would necessarily agree with that, except she's not necessarily past the time that what was instituted as a result of that was a second-class employee's position within a male locker room or within the male shop. I believe my time has expired. Okay, thank you. The case is submitted.
judges: Kavanaugh, Edwards, Sentelle